# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-00028-COA

ANDRE K. KENNEDY A/K/A ANDRE KENNEDY          APPELLANT

v.

STATE OF MISSISSIPPI          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2018 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ERIN ELIZABETH BRIGGS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/23/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

BARNES, C.J., FOR THE COURT:

¶1.     A Hinds County Circuit Court jury convicted Andre Kennedy of armed robbery, attempted kidnapping, and burglary. The trial court sentenced Kennedy to forty-five years for armed robbery, five years suspended and forty years to serve, and placed on five years of post-release supervision; to serve twenty-five years for attempted kidnapping; and to serve twenty years for burglary, with the sentences ordered to run concurrently in the custody of the Mississippi Department of Corrections (MDOC). The court denied Kennedy's motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. He

appeals, arguing that the circuit court erred in refusing the defense's requested jury instructions on circumstantial evidence. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. At approximately 6:00 a.m. on May 16, 2015, two armed men wearing bandannas over their faces approached Dr. Lawrence Goldstein in his driveway while he was loading equipment for a shooting competition into his truck. Goldstein's wife was asleep in the house. Although Goldstein could not see the men's faces, he later described them as being in their twenties. The men demanded money, and the first assailant put a gun to Goldstein's head. When Goldstein could not find his billfold, the assailants led him into the garage at gunpoint to Goldstein's gun safe. The assailants took handguns and a rifle from the safe and put them in a bag.

¶3. The gunmen then forced Goldstein into his house to find his billfold and cash. The first assailant took $500 cash from the wife's purse. Goldstein could not find his billfold, but he remembered his debit card was in the truck; so the men forced Goldstein to drive his truck to the nearest ATM, with the armed assailants sitting in the back seat. Goldstein withdrew a total of $1,500 in $500 increments. A surveillance video from the bank showed the doctor withdrawing cash from the ATM. According to Goldstein, the assailant sitting directly behind the doctor had a handgun, and the one sitting in the rear passenger seat had a long gun.

¶4. Goldstein was then directed to a wooded area near his home behind Northminster Baptist Church on Ridgewood Road in Jackson, Mississippi. Knowing Goldstein's wife had

2

jewelry, the assailants told him that they were going back to his house to get his wife, and they directed Goldstein to get out of the truck. As he opened the door, Goldstein grabbed a 9mm handgun hidden in the side pocket of the driver's door and began shooting at the men, fatally wounding the first assailant seated behind him. The second assailant escaped, running toward Goldstein's home. Worried for his wife's safety, Goldstein removed the first assailant from the truck and began driving home. Turning onto Ridgewood Road, Goldstein saw the second assailant get into a SUV parked at the church's rear parking lot. As the SUV began to exit the lot, Goldstein shot at it three times. However, the SUV continued out of the parking lot onto Eastover Drive, and Goldstein lost sight of it. The doctor returned to where he had shot the first assailant, who was later identified as Edwin Robinson. He then went to the nearest house to call his wife and 911.

¶5. An investigation by the Jackson Police Department (JPD) led to the arrest of Kennedy, Robinson's best friend and roommate. Kennedy was indicted on February 26, 2016, for armed robbery, attempted kidnapping, and burglary of a dwelling. A jury trial was held in the Hinds County Circuit Court on December 10-12, 2018.

¶6. JPD Detective James Roberts testified to his investigation of the case. He identified Robinson, the deceased assailant, from an ID card in his pocket and notified Robinson's mother, Regina Jefferson, of his death. Jefferson told the investigator that if her son was with anyone it would have been Kennedy, Robinson's roommate; so the police went to Kennedy and Robinson's apartment and spoke with Jacqueline Funchess, Kennedy's girlfriend. According to Roberts, Kennedy came to the police station on May 19 and gave

3

a statement. Kennedy, an MDOC employee, had an arm injury that he claimed he received at work the previous night. Roberts noted that there were "graze marks" on the driver's side door of Kennedy's SUV. Kennedy told the detective that his SUV had been damaged in an accident a couple of weeks earlier and that his left rear taillight was out. Kennedy denied being with Robinson on the morning of the incident, instead claiming that he awoke at 5:00 a.m. and went driving. Worried something was wrong, Kennedy told Roberts that he rode around south Jackson looking for Robinson without success. He returned to his apartment, gathered his things, and left for a National Guard drill. Funchess told Roberts a different story—that Kennedy had left with Robinson the night before and that when he returned that morning, Kennedy had been injured.

¶7.     Goldstein, the victim, could not identify Kennedy as the second assailant due to the bandanna covering his face. Goldstein said that the second assailant got into a tan SUV with a rear light out and no license plate and that upon viewing the church's surveillance video and still photograph, Goldstein identified the SUV as being the one he saw drive out of the parking lot. He also identified the person seen running in the video as the second assailant. Goldstein testified that the assailants stole $1,500 that he withdrew from the ATM and $500 from his wife's purse, none of which was recovered.

¶8.     The pastor from Northminster Baptist Church identified a surveillance video from the morning of the incident showing the church's back parking lot adjacent to the Goldstein house and a drive-through area. The video and still shots show an individual running toward the parking lot and then an SUV, with the rear taillight out, exiting the parking lot.

4

¶9.    JPD mobile crime scene Investigator Maimee Barrett processed the crime scene, collecting evidence and taking photographs.  Barrett testified that she observed a white Toyota pick-up truck with blood stains on the back seat, a deceased subject (Robinson) on the ground, spent shell casings near the body, and Goldstein's gun on the truck-bed cover.  Goldstein's pack containing some weapons was also found on the rear floor and seat.  Robinson was wearing blue disposable gloves and a white kerchief.  Upon searching Kennedy's SUV, Barrett noted that the left taillight was burned out and that the SUV had an easily removable license plate.  There was a bullet hole or graze on the driver's side of the SUV.  Barrett recovered blue disposable gloves, similar to the gloves found on Robinson, from the front passenger-side door of Kennedy's SUV.  She also recovered a glass-shop receipt from the interior of the SUV that showed a rear panel window was replaced on the day of the incident.

¶10.    Robinson's mother, Jefferson, testified that she had known Kennedy for several years because her son Robinson and Kennedy were best friends.  She said that Robinson lived with Kennedy and Funchess and that Kennedy had been at her house numerous times.  According to Jefferson, Kennedy came to see her on May 16, wearing his army clothing, and said that his dad had told him about Robinson's death.  That night, Jefferson talked with Kennedy by phone, and he told her that he and Funchess were in the room when Robinson told them he was going out.  Kennedy said that he did not know with whom Robinson left, he just knew that he left.  The following day, Kennedy and Funchess brought some of Robinson's things to Jefferson, and Kennedy again said that Robinson left with someone else but he did not

5

know whom. Jefferson said that Funchess commented, "[T]hat's not what you told me, Andre," and Kennedy "snatched her up by her arm" and took her outside. Jefferson also noted a bandage on Kennedy's arm. Jefferson identified the SUV in the church's surveillance video as Kennedy's and stated with certainty that the man seen in the video and photograph was Kennedy.

¶11. Funchess testified that she and Kennedy had been dating about six months prior to the May 16, 2015 incident. Funchess, Kennedy, and Robinson (a.k.a. "D") began sharing an apartment about three months before Robinson's death. On Friday, May 15, Kennedy and Robinson left the apartment and returned home around midnight, claiming to have been taking care of business. The men were searching for Kennedy's bandanna and asked Funchess if she had seen it. She had not; so the men went to the back of the apartment and left thirty minutes later, not informing Funchess where they were going. Kennedy returned home around 6:30 a.m. on May 16, telling Funchess that after he dropped Robinson off, he went to the Natchez Trail. When Kennedy returned to pick him up, he found Robinson dead. Kennedy told Funchess someone started shooting at him when was trying to see the body. Funchess testified that Kennedy's arm was hurt, and she bandaged it. Then she went with Kennedy to a glass-repair shop to get the window replaced in his SUV because the window had been shot out when he was trying to get Robinson.

¶12. The following day, the couple went to see Jefferson. According to Funchess, Kennedy told Jefferson that he had been with Funchess all night and that Robinson had gone out and taken his SUV. Kennedy also told Jefferson that he found out about Robinson's

death when they did. Funchess testified that Kennedy told Jefferson a different story than what he told her, including when he learned of Robinson's death. Kennedy had a large amount of cash when he returned home that Saturday morning, and she said that it was unusual for him to have that much cash. Kennedy previously told her about a money scheme that he, Robinson and a second friend named "D" had planned; so she assumed that was where he got the money. On May 16, Kennedy paid their past-due rent ($600) and his past-due car note that was over $400. In the following days, they took Funchess's brother to the movies and Kennedy's sisters to Chuck E. Cheese. Kennedy and Funchess also went shopping for clothes and jewelry with the extra cash. Receipts from their shopping trip were found in his SUV and admitted into evidence. When the police came to their apartment on May 16, Kennedy was not home. He had left, claiming that he was going to his weekend drill with the National Guard. On May 19, Funchess gave a statement to the police, telling them that during the time Kennedy was gone to drill, the second friend of Kennedy's named "D" stopped by the apartment looking for Kennedy. When he learned Kennedy was not home, this "D" got in his vehicle, "screaming and talking to himself." Funchess identified Kennedy and his SUV in the church surveillance video and still photographs, noting that he was wearing the same black shirt and khaki pants in the video that he had on when he left their apartment with Robinson. Funchess said that the second friend named "D" was not the man in the surveillance video and photograph; the second "D" was taller and darker than Kennedy.

¶13. An employee with Auto Glass Now in Richland testified that Kennedy came to the

shop on May 16, 2015, between 12:00 and 5:00 p.m. to have a window replaced. He replaced the back quarter glass on the driver's side of Kennedy's SUV. He noticed that Kennedy had his arm bandaged and that there was blood on the steering wheel; so he asked Kennedy if he broke out the window with his arm. Kennedy responded that he shot the glass out. The employee later identified Kennedy in a photo lineup.

¶14.    The State rested, and Dexter Russell, Kennedy's father, testified for the defense. According to Russell, the SUV in the surveillance video "look[ed] similar to the one [his] son had," but he did not recognize the person seen running in the church video as his son, Kennedy.

¶15.    During the State's rebuttal, one of Goldstein's neighbors testified that he was walking his dog before 6:00 a.m. on May 16 and noticed an "older Chevy Blazer with heavy tinted windows and no tag" backed into a parking space at the church. About an hour later, he heard gunshots. Funchess again testified that she recognized the man in the church's video and the photograph as Kennedy. Funchess reiterated that Kennedy was wearing the same clothes in the video that he had been wearing when he left their apartment and returned home later that day. Even though she could not see his face very clearly in the video, Funchess said she knew his stature and his build, and she had no doubt that it was Kennedy. She was also sure that the SUV in the video was Kennedy's.

¶16.    The jury found Kennedy guilty of all counts. On December 18, 2018, the court sentenced Kennedy to serve the following sentences in the custody of the MDOC: Count I, armed robbery: forty-five years, with five years suspended and forty years to serve, and

placed on five years of post-release supervision; Count II, attempted kidnapping: twenty-five years to serve; and Count III, burglary of a dwelling: twenty years to serve. The sentences were ordered to run concurrently with credit for time served.

¶17. Kennedy filed a motion for a JNOV, alleging, among other assignments of error, that "[t]he court erred in refusing appropriate jury instructions offered by Mr. Kennedy, including but not limited to [d]efense instructions concerning the circumstantial evidence presented in this case, D-12 and D-13, resulting in the improper and incomplete instruction of the jury[.]" The trial court denied the motion, and Kennedy now appeals, reasserting his argument that the court erred in denying his circumstantial-evidence instructions.

## STANDARD OF REVIEW

¶18. This Court reviews a trial court's giving or refusal of jury instructions for abuse of discretion. *Taylor v. State*, 109 So. 3d 589, 595 (¶18) (Miss. Ct. App. 2013) (citing *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012)). "When reviewing the giving or refusal of jury instructions, we do not view the jury instructions in isolation, but instead we consider them as a whole." *Id.* (citing *Rushing v. State*, 911 So. 2d 526, 537 (¶24) (Miss. 2005)).

## DISCUSSION

¶19. The sole issue raised by Kennedy concerns whether the trial court erred in failing to give the defense's circumstantial-evidence instructions, Jury Instructions D-12 and D-13, which stated:

> Jury Instruction D-12: The [c]ourt instructs the jury that if there are two plausible theories arising out of the evidence in this case, and one tends to prove that Andre Kennedy committed the crimes charged herein, and another tends to prove that some other theory of who committed the crimes charged

9

herein, and if the jury is unable to determine from the evidence which of the two theories is true, the jury must accept that theory most favorable for Andre Kennedy and find him not guilty.

Jury Instruction D-13: The [c]ourt instructs the jury that if there is a fact or circumstance in this case susceptible to two interpretations, one favorable and the other unfavorable to Andre Kennedy, and when the jury has considered said fact or circumstance with all other evidence, and there is a reasonable doubt as to the correct interpretation, then you, the jury, must resolve such doubt in favor of Andre Kennedy, and place upon such fact or circumstance the interpretation most favorable to Andre Kennedy.

The [c]ourt instructs the jury that if you can reconcile the evidence upon any reasonable hypothesis consistent with Andre Kennedy's innocence, you should do so and find him not guilty.

Kennedy contends that because there was no confession or any eyewitnesses that could identify Kennedy as the assailant, the evidence was "wholly circumstantial," and the court's failure to give the circumstantial-evidence instructions was error.

¶20. The Mississippi Supreme Court has held that "[d]irect evidence . . . must directly and not by inference implicate the accused and not just show that there has been a crime." *Burleson v. State*, 166 So. 3d 499, 509 (¶29) (Miss. 2015) (internal quotation mark omitted). "[E]xamples of direct evidence include an admission or confession by the defendant to 'a significant element of the offense,' or eyewitness testimony 'to the gravamen of the offense charged.'" *Id*. (quoting *Kirkwood v. State*, 52 So. 3d 1184, 1187 (¶10) (Miss. 2011)).

¶21. Circumstantial evidence, on the other hand, is "evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *Id*. (quoting *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985)). If there is no confession or eyewitness testimony "to the gravamen of the offense charged, the defendant is entitled to

10

an instruction requiring the jury to exclude every other reasonable hypothesis other than that of guilt before a conviction can be had." *Id*. (citations and internal quotation marks omitted). "A circumstantial-evidence instruction provides that the State must prove the defendant guilty beyond a reasonable doubt and to the exclusion of all reasonable hypotheses consistent with innocence." *McInnis v. State*, 61 So. 3d 872, 875-76 (¶11) (Miss. 2011) (emphasis omitted). "A two-theory instruction provides that when a jury has considered facts and circumstances along with all other evidence, and every reasonable theory of innocence has been excluded, the jury must resolve the case in favor of the defendant." *Evans v. State*, 119 So. 3d 1084, 1086 (¶10) (Miss. Ct. App. 2013).

¶22.    At trial, the State proffered two circumstantial-evidence instructions, S-8 and S-9. The trial judge expressed hesitation in giving the State's circumstantial-evidence instructions, citing two cases: *Harris v. State*, 908 So. 2d 868 (Miss. Ct. App. 2005), and *Johnson v. State*, 999 So. 2d 360 (Miss. 2008). Upon review of the cases, the State withdrew S-9 and objected to the defense's proffered circumstantial-evidence instructions. With no objection by the defense, the trial court gave instruction S-8, which stated:

> Any fact in this case may be proved by either direct or circumstantial evidence or by both. "Direct evidence" is direct proof of a fact such as testimony by a witness about what that witness personally saw, heard, or did. "Direct evidence" is the testimony of someone who claims to have actual knowledge of a fact. "Direct evidence" is simply evidence which, if you believe it directly proves a fact. An example is if a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.
>
> "Circumstantial evidence" is proof of a fact or facts from which you could conclude, by your reason and common sense that another fact exists even though it has not been proven directly. "Circumstantial evidence" is proof of

11

one or more facts from which you could find another fact. "Circumstantial evidence" is simply a chain of circumstances that indirectly proves a fact. An example is if someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella that would be circumstantial evidence from which you could conclude that it was raining.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You as the jury should decide how much weight to give to any evidence.

However, when the trial judge asked if the defense was withdrawing D-12 and D-13, defense counsel replied, "Absolutely not, Your Honor," standing by its proffer of the two instructions on the basis that all of the evidence was circumstantial. The trial judge refused D-12 and D-13, finding that there was eyewitness testimony by the victim and that other evidence presented by the State "was consistent with the eyewitness testimony." In light of the court's ruling, defense counsel subsequently objected to the court's giving Jury Instruction S-8.

¶23. We find no error in the trial court's refusal of D-12 and D-13. "To receive the two-theory instruction, the evidence must be purely circumstantial and two reasonable hypotheses or theories arising out of the evidence must be presented to the jury." *Johnson v. State*, 235 So. 3d 1404, 1412 (¶24) (Miss. 2017). In *Johnson v. State*, 999 So. 2d 360, 366 (¶27) (Miss. 2008), the defendant asserted a claim of ineffective assistance of counsel for failure to ask for a circumstantial-evidence instruction, arguing that the evidence in the case was completely circumstantial because there were no eyewitnesses and no confession. *Id*. at 366 (¶27). The case involved the armed robbery of a fast-food restaurant, and the testimony was that the robber wore a ski mask; so none of the victims could positively identify the defendant as the armed robber. *Id*. at 361, 366 (¶¶1-2, 27). The Mississippi

Supreme Court determined there was direct evidence of the armed robbery by four employees who were eyewitnesses to the crime and who testified to items used or taken by the masked gunman during the robbery and to his threats to kill them. *Id*. at 367 (¶30).

¶24. Likewise, in the present case, we find there was direct evidence to prove the charged offenses. Although the victim (Goldstein) could not positively identify Kennedy, he was an eyewitness to the "gravamen of the offense charged," identifying the person in the church's surveillance video and photograph as the second assailant. He also identified the SUV in the video as the one the assailant got into and drove from the parking lot. Both Funchess, Kennedy's girlfriend, and Jefferson, who had known Kennedy for years, identified Kennedy and his SUV in the surveillance video and photograph.

¶25. Moreover, Kennedy told Funchess that he was present at the crime scene. According to Funchess, Kennedy dropped off Robinson and when he came back to pick him up, he found Robinson dead and "that's when someone started shooting at him" and the window of his SUV was "busted . . . . when they was shooting at him after he was coming back to get [Robinson]." In *Price v. State*, 749 So. 2d 1188, 1197 (¶29) (Miss. Ct. App. 1999), this Court determined that although the defendant's statement that he had been at the scene of the crime within hours of the crime was not an admission to the crime, it did constitute "'an admission by the defendant on a significant element of the offense' that 'render[ed] unnecessary the circumstantial evidence instruction.'" (Quoting *Mack v. State*, 481 So. 2d 793, 795 (Miss. 1985)). Here, while Kennedy did not confess to being the second assailant, we find that his statement to Funchess—that he was at the scene of the crime for another

13

purpose and was shot at—constituted additional direct evidence as "an admission to a significant element of the offense." "If any evidence qualifies as 'direct' evidence, a circuit court may refuse a circumstantial-evidence instruction." *Allen v. State*, 111 So. 3d 679, 684 (¶10) (Miss. Ct. App. 2013) (citing *McInnis*, 61 So. 3d at 876 (¶13)).

¶26. Accordingly, we find the trial court did not err in refusing the defense's proposed circumstantial-evidence instructions.

¶27. **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE AND C. WILSON, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J.**

**McCARTY, J., DISSENTING:**

¶28. Because the only evidence presented at trial was circumstantial, the defendant was entitled to a circumstantial-evidence jury instruction. For this reason, I respectfully dissent.

¶29. "The Rule in Mississippi is that a circumstantial evidence instruction should be given only when the prosecution can produce neither eyewitness or a confession to the offense charged." *Stringfellow v. State*, 595 So. 2d 1320, 1322 (Miss. 1992). In this case, the defendant did not confess, and there was not an eyewitness that he committed any crime.

¶30. "[E]vidence that implicates the defendant by inference is circumstantial evidence, without regard to how persuasive the inference appears to be." *Moore v. State*, 247 So. 3d 1198, 1202 (¶17) (Miss. 2018). "Moreover, the sum of circumstantial evidence, however great it may be—and although often it is sufficient to sustain a conviction—*never becomes*

14

*direct evidence.*" *Id*. (emphasis added). "Direct evidence, on the other hand, must directly and not by inference implicate the accused and not just show that there has been a crime." *Grace v. State*, 290 So. 3d 1261, 1264 (¶13) (Miss. Ct. App. 2019).

¶31. I believe today this Court is making the same mistake the Supreme Court had actually corrected in another case dealing with circumstantial evidence. *McInnis v. State*, 61 So. 3d 872, 876 (¶14) (Miss. 2011). There, the evidence presented was that the defendant was spotted in the vicinity of the crime immediately after the burglary occurred, the victim's purse was found in the front seat of the car the defendant was driving, and the testimony of the burglary victim—who could only identify the perpetrator as a "stocky black male wearing a white T-shirt." *Id*. at 874 (¶8). This Court of Appeals found that rough and generic description to be direct evidence against the defendant and affirmed the trial court's denial of a circumstantial evidence instruction. *Id*.

¶32. Then the Mississippi Supreme Court unanimously reversed: "While the Court of Appeals identified various testimony as direct evidence that a crime was committed, this was not direct evidence that *McInnis* committed the crime[.]" *Id*. at 877 (¶14) (emphasis by the Court).

¶33. In this case, just as in *McInnis*, Kennedy never confessed, and the State never presented a single eyewitness that Kennedy committed any crimes. The victim did not testify that he saw Kennedy do anything, because he could not identify him; rather the victim's testimony only proved that the crime had occurred. Likewise, the victim's girlfriend's testimony only proved that Kennedy was in the vicinity. The jury was left to fill in the gap

15

that Kennedy was the perpetrator.

¶34.    The State itself even acknowledged this was a circumstantial case, if not a two-theory one, when it offered Jury Instruction S-9—a circumstantial evidence instruction.[1]  Further, the State even stated that it "believe[d] a circumstantial evidence instruction *is required*[.]" (Emphasis added).

¶35.    Because we are making the same mistake as in *McInnis*, I respectfully dissent.

**McDONALD, J., JOINS THIS OPINION IN PART.**

---

[1] Jury Instruction S-9 read:

The Court instructs the Jury that unless the State has proved the defendants guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence then you must find the defendant not guilty.